SOLOMON v. FIRST NATIONAL BANK.

Opinion delivered March 15, 1926.

1. PARTNERSHIP—NONTRADING FIRM—POWER OF MEMBER TO ISSUE NEGOTIABLE PAPER.—One seeking to hold a nontrading or noncommercial partnership liable on a note given by one member in the name of the firm has the burden of showing that the instrument was executed by the authority or with the knowledge and consent of all the partners, or that it was necessary in the course of their business, or usual in similar partnerships, or that the act of such partner has been ratified by the firm.

2. PARTNERSHIP—CUSTOM OF ISSUING NEGOTIABLE PAPER.—Proof of the execution of notes in payment of partnership indebtedness for supplies for their farm would not, of itself, support a finding that authority existed to issue notes for other purposes if the partnership was in fact a nontrading one.

3. APPEAL AND ERROR—EXCLUSION OF EVIDENCE.—That the trial court erred in excluding evidence will not be considered on appeal where it is not shown what the evidence would have been, had the witness been permitted to answer.

Appeal from Phillips Circuit Court; E. D. Robertson, Judge; reversed.

John I. Moore, Sr., and J. G. Burke, for appellant.

Brewer & Cracraft and W. G. Dinning, for appellee.

SMITH, J. This suit was brought to enforce the collection of a note dated October 28, 1920, due ninety days after date, signed "Solomon & Jarman, by Amos Jarman," payable to the order of R. B. Campbell, and by the payee indorsed, for value, to the First National Bank of Helena, Arkansas, the plaintiff in the case.

The president of the bank testified that Campbell was extensively engaged in operating farm property, and that it was necessary from time to time for Campbell to borrow large sums of money. That the bank bought a note from Campbell and placed the proceeds to Campbell's credit, and that this note was renewed from time to time until October 28, 1920, when the last renewal was made, and that the renewal note then executed was the note in suit. The witness did not remember whether the interest had been paid by Campbell or by Jarman, but the interest was paid at each renewal. The witness knew nothing about the transaction between Campbell and Solomon & Jarman evidenced by the note.

On December 17, 1917, the bank had bought a note of Jarman & Solomon, payable to N. Straub & Sons, for $3,902.12. This note was renewed from time to time, and was paid on May 27, 1919. The bank had also bought another note signed by Jarman & Solomon, payable to Straub & Sons, dated March 24, 1917, for $1,375.88, and this note was paid November 15, 1917. The bank had also bought a note signed by Jarman & Solomon, to the order of W. N. & S. Straub, dated February 6, 1919, for $1,344.47, which was paid November 14, 1919. The bank had no knowledge of any defect in the note here involved. The president of the bank further testified that it is customary for farmers and planters, especially those operating on a large scale like Jarman & Solomon, to borrow money from time to time in making and gathering their crops. The witness did not see the note signed which the bank bought, but the signature was that of Amos Jarman, who was a member of the copartnership of Jarman & Solomon. The style of the copartnership was Jarman & Solomon, and the witness did not notice that the note in suit was signed Solomon & Jarman. Straub & Sons sold supplies and feed and hay to farmers and others, but Campbell, who was a lawyer, was not in business except to furnish tenants on his own lands, for which purpose he borrowed money from other people.

Campbell was a director in and the attorney for the plaintiff bank. Jarman always renewed the note, and Campbell indorsed it. Jarman died in November, 1920.

C. R. Nicholson testified that from 1913 to 1919 he was employed as farm manager by Jarman & Solomon in the cultivation of a farm of about six hundred acres. The tenants on the place were furnished supplies out of the commissary of Jarman & Solomon on the place, and the copartnership owned enough stock and farming implements to cultivate the land. From 150 to 400 bales of cotton were usually grown on the farm, and a gin was operated on the place where the cotton was ginned. Some outside cotton was ginned, and sometimes the firm of Jarman & Solomon bought the seed after ginning the custom cotton. Most of the tenants farmed as share croppers, and their cotton and cottonseed were usually bought and paid for at the gin by Jarman & Solomon, and the cotton was usually shipped to Helena once each week. The commissary on the place was kept open one day each week, when plantation supplies were sold the tenants. The stock of supplies at the commissary average about $300, and was operated solely for the purpose of furnishing the tenants on the place. Most of the supplies for the firm were bought from Straub & Sons and the Helena Grocery Company, and nothing had ever been bought by the firm from Campbell.

S. Straub of the Straub firm testified that it was customary for farmers to borrow money from the banks to operate on; that the firm of Jarman & Solomon bought supplies from witness' firm, usually on a credit of from thirty to ninety days, and note would be given in payment. The notes so given by the firm of Jarman & Solomon, which were executed by Jarman, were sold to the plaintiff bank, and later paid by the firm of Jarman & Solomon. The notes of Jarman & Solomon so given were for merchandise and supplies used on the plantation.

Defendant Solomon testified that the copartnership of Jarman & Solomon was formed in 1912 for the pur-

pose of farming about 650 acres of land, and the farming operations were carried on by a farm manager, and the money borrowed for the copartnership business was borrowed from the Security Bank & Trust Company, and the copartnership had never had any business with the plaintiff bank. Witness knew about the execution of the notes to the Straub firm. These notes were for farm supplies. The firm of Jarman & Solomon had never had a business transaction with Campbell, and was never indebted to Campbell at any time. When Jarman died, witness qualified as administrator of Jarman's estate, and found among Jarman's papers a note to the effect that Jarman had loaned Campbell the sum of money evidenced by the note in suit. This was the first information witness had of the transaction. The firm of Jarman & Solomon kept books showing the business of the firm, and there was no entry on the books of the copartnership showing this loan. Witness Solomon further testified that the copartnership was engaged in farming; that it did not buy or sell notes, or do any other commercial business not connected with the operation of the farm; that it did not operate a store or other mercantile business, and that a small commissary was maintained for the sole purpose of supplying the tenants on the farm; that a gin was installed for the use of the farm, and, while some outside cotton was ginned, it did not amount to much; that the gin was a necessary incident to the operation of the farm, and the stock of merchandise carried in the commissary consisted of staple articles, such as meat and flour, to be furnished to the tenants on the place.

At the conclusion of the introduction of the above testimony the court directed the jury to return a verdict for the bank, which was done, and from the judgment pronounced on that verdict is this appeal.

We think the above testimony made a case which should have been submitted to the jury. The evidence appears to be undisputed that the note to Campbell was not for a partnership indebtedness or transaction, and it

can not be said to be an undisputed fact that Solomon was aware of this transaction or had in any manner ratified it. It is true there had been several renewals of the note, but Solomon testified that he was as ignorant of that fact as he was of the original transaction, and, according to Solomon's testimony, the copartnership was essentially a nontrading one. It is true that Solomon admitted the copartnership had borrowed money and had executed notes, but he testified that in each instance of which he had knowledge this was done in payment of supplies required in the operation of the farm. This may have been more than a mere farming partnership, but we do not think it can be said that no other inference can reasonably be drawn from the testimony.

In the annotator's note to the case of *Gordon* v. *Marburger*, 9 A. L. R. 369, it is said: "It is well established that a member of a nontrading or noncommercial partnership has no power to execute negotiable paper in the firm name, unless it is the common custom or usage, or is necessary for the transaction of business of the firm, or unless other facts are shown to exist, sufficient to warrant the conclusion that the acting partner had been invested by his copartners with the requisite authority, or that the firm has ratified the act by receiving the benefit of it. 20 R. C. L. 900. A partnership for the purpose of working land or raising crops being a nontrading partnership, the general rule naturally follows that a member of such a firm has no implied authority to bind the firm by the execution of negotiable paper."

At § 111 of the chapter on partnership, 20 R. C. L. page 901, the law is stated as follows: "The restrictions surrounding the right of noncommercial partnerships to issue negotiable paper are such that one seeking to hold such a firm liable on a note given by one member in the name of the firm has the burden of showing that the instrument was executed by the authority, or with the knowledge and consent, of all the partners, or that it was necessary in the course of their business, or usual in

similar partnerships, or that the act of such partner has been ratified by the firm.''

Our own case of *Alley* v. *Bowen-Merrill Co.*, 76 Ark. 4, agrees with these general statements of the law. In that case it was said: ''It is generally held that non-trading firms have no power to borrow money and sign negotiable paper, and that one member of such firm has no power to bind the other members by signing the firm name to such paper. *Worster* v. *Forbush,* 171 Mass. 423; *Smith* v. *Sloan,* 37 Wis. 285; 22 Am. & Eng. Enc. Law, p. 154, note (Lawyers). This is because such transactions are not generally within the legitimate scope of the business of such firms. There is no reason why such firms should not be bound by the acts of their members within the scope of their business. This would be true, even in the case of negotiable paper, where it was shown that such paper was executed within the scope of the firm's business. 1 Bates, Part., § 343. Mr. Bates, after an exhaustive review of the authorities on the powers and liabilities of nontrading partnerships, says: 'Each partnership must stand largely on the nature of its peculiar business, and no rule of universal application is possible.' This is the correct doctrine.''

It is insisted for the affirmance of the judgment of the court below that the testimony shows such long continued custom on the part of Jarman to execute paper in the name of the firm that authority so to do will be implied. This too is, in our opinion, a question of fact properly for the jury. In this connection we take occasion to say that proof of the execution of notes in payment of partnership indebtedness for supplies for a farm would not, of itself, support a finding that authority existed to issue notes for other purposes if the copartnership is, in fact, a nontrading one.

A witness named Sanders was called to testify in behalf of the defendant Solomon, and was shown the note in suit, and was asked whether the signature was in the handwriting of Jarman. An objection to this question

was sustained, and the witness was not permitted to answer, and an exception was duly saved to that ruling. This assignment of error may be disposed of by saying that it was not shown what the witness' answer would have been had he been permitted to answer.

Under the facts stated, the court should have submitted the questions: (a) whether the copartnership was a nontrading one, and, if so, (b) whether there had been a custom for Jarman to use the firm credit in a manner to imply authority; and for the error in not submitting these questions the judgment of the court below must be reversed and the cause remanded, and it is so ordered.